# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs February 14, 2012

## STATE OF TENNESSEE v. O'NEAL JOHNSON

**Direct Appeal from the Criminal Court for Shelby County**
No. 0805447     Chris B. Craft, Judge

**No. W2011-00975-CCA-R3-CD  - Filed June 18, 2012**

Following a jury trial, the defendant was convicted of attempted second degree murder, a Class B felony.  He was sentenced  to serve twenty years in prison as a Range II multiple offender.  The defendant appeals the sufficiency of the evidence supporting his conviction for second degree murder, based primarily on his contention that the evidence is not sufficient to show that he acted knowingly or without adequately provoked passion.  We conclude that the evidence is sufficient to support the conviction and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Stephen C. Bush, District Public Defender, and Harry E. Sayle, III (at trial and on appeal), and Michael Johnson (at trial), Assistant Public Defenders, for the appellant, O'Neal Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Stephanie Johnson and Marianne Bell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## Factual Background

On December 3, 2007, after the defendant, O'Neal Johnson, heard that his fiancee[1] was having an affair with the victim, Willie Burnett, Jr., the defendant shot the victim. The shooting took place at Methodist Laundry, the victim's place of work, and the confrontation began in the parking lot as the victim was exiting a vehicle driven by Quincy Woods. The defendant was indicted for attempt to commit the first degree murder of Mr. Burnett, a Class A felony, and for reckless endangerment of Mr. Woods with a deadly weapon, a Class E felony. A jury found the defendant guilty of the lesser included offense of attempted second degree murder on the first count and acquitted him of reckless endangerment. The defendant was sentenced to twenty years imprisonment as a Range II offender, to be served consecutively to a prior conviction for rape of a child and consecutively to a sentence for contempt of court. The defendant filed a motion for a new trial on March 11, 2011, and it was heard and denied that same day, after which the defendant filed a timely notice of appeal. The defendant appeals his conviction, contending that the evidence is not sufficient to support the verdict. Specifically, the defendant asserts that there was not sufficient evidence that he acted knowingly and in the absence of a state of passion.

At the multi-day trial, the State introduced numerous witnesses to testify about the events of the day of the shooting and the subsequent search for the defendant. The victim testified that he was a truck driver at Methodist Laundry at the time of the shooting. According to the victim, he generally left the facility around 10:00 a.m. and returned between 3:00 and 4:00 in the afternoon. That week, the victim was training Quincy Woods, and Mr. Woods was driving the vehicle, which was a small truck called a bob truck. The victim stated that he knew the defendant because he had seen the defendant pick up the defendant's fiancee, and because the defendant had also worked briefly at Methodist Laundry. The defendant was not employed there at the time of the shooting. The victim testified that at the time of the shooting, he had been having a sexual relationship with the defendant's fiancee for a period of two months.

According to the victim, at around 3:15 p.m., he and Mr. Woods had been sitting in the truck for fifteen to twenty minutes doing some paperwork. The victim testified that the security gate was open because the truck was parked too close to the sensor to allow it to close. Mr. Woods then called the victim's attention to someone approaching the truck on the driver's side. The truck's height obstructed the victim's view until the defendant had come around the front of the vehicle to the passenger's side, at which time the victim identified the approaching individual as the defendant. The victim testified that he opened the door of the car, at which point the defendant said, "I heard you was F'ing my girlfriend, and I'm going to kill you." The victim testified that he saw that the defendant had a gun in his waistband

---

[1]It is the policy of this Court to protect the identity of minor victims of sexual assault. Because the defendant, in a separate case, was convicted of the rape of his fiancee's twelve-year-old daughter, who shares her mother's last name, we will not use the full name of the defendant's fiancee in this opinion.

and tried to close the door.  The defendant prevented him from shutting it.  The victim finally pushed the door open, jumped from the truck, and ran towards the building.  According to the victim, he did not say anything to the defendant and had no weapon of any kind.  He testified that although they struggled over the door, he never fought with or hit the defendant; he testified that he did not know if he hit the defendant with the door when he began to flee.  He testified that while he was running away from the defendant, he heard "a couple" of shots and was shot in his left leg.  The victim testified that he ran through the closed doors and kept running inside the building, heard more shots, and was shot in the right shoulder.  The victim stated that he kept running until he was shot again in his right leg, which broke.  At that point, the victim testified he fell and could no longer move.  The victim's testimony was that he spoke with the police while under medication, but he recalled identifying the defendant as his shooter.  The victim picked the defendant as the shooter when he was shown a photographic display on the following day.

On cross-examination, the victim testified that, to the best of his knowledge, the defendant had not known about his relationship with the defendant's fiancee.  The victim testified that he had a girlfriend, Gloria Jackson, who also worked at Methodist Laundry and also did not know about the relationship with the defendant's fiancee until the day of the shooting.  The victim stated that he did not know if he had slammed the door on the defendant's hand during the struggle over the door.  On redirect, the victim testified that the defendant had not seemed upset as he approached the vehicle, but seemed angry after he threatened to kill the victim.

Quincy Woods also testified for the State.  He testified that, generally, he would drive the bob truck during the first part of the day and then return to the facility and switch to the larger truck, which he would operate from about 3:30 p.m. to 5:30 or 6:00 p.m.  Mr. Woods testified that, on the day of the shooting, as he pulled in through the gate, he used his mirror to observe a gray car pull in behind the truck, and then the gate closed.  He testified that he asked the victim if he knew who it was and noted that there were children in the car.  The victim stated that he did not know.  Mr. Woods, who did not know the defendant at the time, saw a man he later identified as the defendant walk up to the driver's side of the truck, look in the window, and then walk around the front of the truck to the passenger's side.  The defendant looked puzzled when he looked in the driver's side window and looked angry as he began to go around the truck.  Mr. Woods did not see anything in the defendant's hands.

Mr. Woods testified that the defendant pulled on the locked door and that the victim then opened the door.  The defendant asked the victim if he was having an affair with his fiancee.  According to Mr. Woods, the victim denied it, and the two men began to "tussle" in the doorway as the victim attempted to shut the door and the defendant tried to keep it open.  Mr. Woods testified he then heard a shot, and the victim came out of the truck.  Mr. Woods' testimony was that this first shot was fired while the victim was in the passenger's

seat and Mr. Woods was seated about a foot away. Mr. Woods testified that he could see the two men from the waist up and the men continued to "tussle" until the victim hit the defendant three times in the face and then ran away. Mr. Woods then stated he saw the defendant run after the victim and heard two more shots but that he did not see the weapon until the defendant exited the building. According to Mr. Woods, he had never seen the victim with any sort of weapon. Mr. Woods testified that he heard five or six more shots in the building and that the shots were back-to-back. He then saw the defendant come out of the building with "some kind of weapon" in his hands, "like a gun." Mr. Woods testified it was a "hand pistol." The defendant was coming towards the truck, so he stepped on the gas. Mr. Woods testified he continued to observe the defendant in his side mirror and saw the defendant drive through the closed gate on his way out. Mr. Woods gave a statement to the police and was shown a mug shot of the defendant.

On cross-examination, Mr. Woods acknowledged that on the day of the shooting, he had given the police a statement and that his memory would have been better at the time. He acknowledged that, when giving the statement, he was asked if he could describe the gun and had responded that he had not see the gun, but only heard it. Mr. Woods testified that at the time, he had told the police it was a handgun, but he did not know if the police had written it down. He acknowledged having signed his written statement which the police prepared for him and in which he stated he did not see the gun. On redirect, Mr. Woods further explained that he could not describe the gun because he could not see it clearly due to the distance, but he "could tell he had something in his hand," and the object looked like a gun. On re-cross, Mr. Woods further testified that he had put the vehicle into drive and had begun to roll forward while the victim and defendant were fighting over the door. He also testified that although his statement was that the defendant pulled the victim from the truck and fired a shot, the men were in the doorway with the victim on the edge of the seat and the defendant pulling him out when the gun fired.

Randy Drake, who was a Methodist Laundry employee, testified that he was taking the trash out a little after 3:00 p.m. when the laundry truck came in, followed by another vehicle. He saw the defendant, whom he recognized as a former employee, get out of the silver car, which he recognized as the vehicle the defendant habitually used to pick up his fiancee. Mr. Drake testified that the defendant had an "automatic weapon" of about three or four inches in his hand. Mr. Drake said he saw the defendant pull on the driver's side door, then run around to the other side, at which point Mr. Drake's view of the defendant and subsequent events was obstructed. Mr. Drake heard three or four shots, which appeared to be moving towards him. Mr. Drake testified that he saw the defendant come out of the building, turn his car around, and exit through the gate. Mr. Drake then went inside and put a tourniquet on the victim's leg. Mr. Drake gave a statement to the police and identified the defendant from a photographic display.

-4-

On cross-examination, Mr. Drake explained that although he had said in his statement to police on the day of the shooting that he did not see a weapon and that "when [the defendant] came out of the building, he had his right arm down by his side," he believed that this was in response to a question regarding whether he saw a weapon when the defendant came out, not whether he ever saw a weapon. Mr. Drake was adamant that he did see a weapon, that he had told the officer as much, and that the police made a mistake. He acknowledged having signed the statement, but stated he "just kind of glanced over it."

The defendant's fiancee testified that she had been in a relationship with the defendant for five years and had been living with him for two years at the time of the shooting. She testified that the defendant at one time owned a gun. The defendant's fiancee, who worked at Methodist Laundry, testified that the defendant generally dropped her off at work in her silver Mercury Sable.

On the day of the shooting, after the defendant dropped her off, she discovered through her manager that some of her co-workers had put a note by the machine where Gloria Jackson, the victim's girlfriend, worked. This note was about the defendant's fiancee. The defendant's fiancee discussed it with another supervisor who told her not to worry about it because Ms. Jackson had not seen her with the victim. At her 11:00 a.m. lunch break, the defendant arrived at the facility and the defendant's fiancee got into her car to eat with the defendant. Ms. Jackson drove up to the driver's side a few minutes later, got out of her car, and asked the defendant if he knew that his fiancee was having a sexual relationship with the victim. The defendant's fiancee testified that the defendant asked Ms. Jackson how she knew that and said that Ms. Jackson had not seen them. The defendant's fiancee stated that she then got out of the car to speak with Ms. Jackson when another co-worker stopped her and advised her to speak to her supervisor about it. She got back in the car with the defendant, and he asked her if Ms. Jackson's accusation were true; she testified that she denied it and said she did not want to discuss it. Because her break was over, she returned to the facility and informed her supervisor about what had happened.

At around 3:15 p.m., the defendant's fiancee went to wash her hands in the back restroom; when she was at the door, she heard a commotion. She testified that she called the defendant from the restroom and was able to talk with him; although he asked her about what Ms. Jackson had said, she still declined to discuss it with him. When she left the restroom, a co-worker told her about the shooting. She testified that she spoke with the defendant on the telephone the following day, when she and other members of her family attempted to convince him to turn himself in. She testified that the defendant returned her car to her, although she did not remember how she got it.

On cross-examination, the defendant's fiancee said that she was upset and crying when she and the defendant discussed Ms. Jackson's accusations in the car. She

acknowledged that her response essentially confirmed Ms. Jackson's accusations. She testified that during her phone calls with the defendant, he told her he was hurt by her actions. Contrary to the victim's testimony, she testified that she believed she had spoken with the victim after the encounter with Ms. Jackson and that she had informed him that the defendant knew about their relationship. She testified that she was somewhat concerned that the defendant would confront the victim and that Ms. Jackson would confront the victim.

Samuel Noe, an employee who witnessed the shooting inside the building, also testified for the State. Mr. Noe testified that he knew the defendant from having worked with him for about a year or year and a half, and that he was aware that the defendant was in a relationship with his fiancee, who was a co-worker. Mr. Noe testified that on the day of the shooting, at around 3:15 or 3:20 p.m., he heard approximately six shots fired. Mr. Noe got down and looked around and saw the defendant, wearing a hoodie, holding his arm out with a small handgun and shooting toward the back of the building. Mr. Noe said that the defendant was six to ten feet away from him and that the defendant was visible while he took two or three steps before Mr. Noe fled to the opposite side of the building. The next day, he identified the defendant from a photographic display.

Jason Gallardo, an officer with the Memphis Police Department, testified that he and another officer were the first to arrive on the scene. He testified that in the east hallway, he observed bullet casings from the door leading up to where the victim was lying on the ground. Officer Gallardo testified that it was possible that he could have moved or kicked some evidence because his main goal was to attend the victim; he also testified that there were some individuals attending the victim when he arrived and that the paramedics also walked through the area. Officer Gallardo identified in a photograph the place where the victim was lying by noting it was where a lot of placards identifying crime scene evidence were placed. He also noted that evidence was recovered outside the doors. The victim was covered in blood and was thereafter transported by the paramedics.

A paramedic who treated the victim at the scene, Daryl McConnell, testified that when he arrived on the scene, the victim was alert but had some early symptoms of shock. He testified there was not a large amount of blood, which was an indication that the bullets had not come out. Mr. McConnell testified that he cut off the victim's clothes and noted that the victim's femur was broken or shattered, and there was an entrance wound on the back of his leg. He also found two wounds on the left thigh and a gunshot wound in the right upper back. Mr. McConnell testified that an injury to the femur can result in the severing of the femoral artery and can be fatal. Mr. McConnell further testified that the bullet in the victim's shoulder could have defected and hit the heart, lungs, or spine, and that the wound was potentially fatal. Mr. McConnell testified that the victim was able to move his extremities. On cross-examination, Mr. McConnell testified that when a bullet remains lodged in the body, there often is not a lot of blood, which could account for the absence of a blood trail

in this case.

Robert Tutt, a sergeant with the Memphis Police Department's felony response unit, testified that when he arrived, the crime scene had been secured. Sergeant Tutt interviewed several witnesses individually, and asked other officers to separate them and bring them to the police station, where officers, including Sergeant Tutt, took written statements. Sergeant Tutt testified that the defendant was developed as a suspect based on the written statements and that Sergeant Tutt gave some possible addresses for the defendant to the criminal apprehension team.

Jeffrey Garey, a patrolman with the Memphis Police Department tasked with crime scene investigation, testified regarding the evidence collected at the scene. Officer Garey testified that he collected and tagged evidence at the scene, created a crime scene sketch and report, and took photographs. Officer Garey testified that he found fifteen spent Winchester nine millimeter Luger bullet casings and four bullet fragments at the scene. He noted that a standard nine millimeter weapon comes with nine to fifteen rounds. He stated that he did not necessarily find every bullet casing, but that he looked for as long as he felt necessary. According to Mr. Garey, evidence such as bullets and casings can get moved around as officers and medical personnel respond at a crime scene. Mr. Garey testified that one casing had been found outside the facility, one found on the door jamb, and the remainder were inside the facility. Mr. Garey also identified pictures of bullet holes in the laundry equipment and a photograph of a bullet recovered among lint in a dryer. Mr. Garey testified that he did not see a gun at the crime scene. Mr. Garey testified that he placed the evidence in an envelope and sealed it.

The State next called Shelly Betts, a special agent forensic scientist in the firearms identification unit at the Tennessee Bureau of Investigation, to testify as an expert witness. Ms. Betts testified that she received the evidence in a sealed envelope and that she resealed it after examining the evidence. She testified that the envelope contained fourteen casings and five bullet fragments. She testified that she was able to determine that all fourteen casings were fired from the same firearm, which was a nine millimeter Glock semi-automatic pistol. She testified that this weapon would hold 10-15 rounds in the magazine but could also have one in the chamber. She was able to determine that all of the bullets were fired from the same class of weapon by the same manufacturer and probably same model but could not conclusively say they were from the same firearm.

Michael Schaeffer, who was at the time a sergeant in the felony assault unit for Memphis Police Department, testified for the State regarding the process of identifying the defendant. Sergeant Schaeffer stated that he received a packet containing supplements or reports from the after-hours felony response unit on the morning of December 4, 2007. As a result, he asked another officer to choose photographs for a photographic display to assist

witnesses in identifying the shooter. Sergeant Schaeffer testified that he went over the advice sheet accompanying the photographic display with the witnesses and asked them to fill it out and sign it. He testified that he handed the photos to the witnesses from the bottom of the page to avoid the appearance that an accidental placement of his finger was meant to signal the suspect. The victim and three other individuals identified the defendant. Sgt. Schaeffer also created a wanted flier for the criminal apprehension team and took a statement from the victim in January.

Michael Warren, the State's next witness, testified that he worked with the organized crime unit and the criminal apprehension team of the Memphis Police Department. He testified that, in the course of searching for the defendant for several hours, he was able to speak with him on the telephone with the assistance of the defendant's fiancee. The defendant refused to turn himself in and eventually hung up.

Anthony Townsend, who was tasked with finding fugitives as part of the Shelby County Sheriff's Office's U.S. Marshals Service Task Force, testified regarding the apprehension of the defendant. He testified that he had conducted surveillance and spoken with defendant's fiancee, but did not capture the defendant until December 14, 2007, when he received information that the defendant's fiancee would be picking up her children and followed her vehicle to a hotel. When officers knocked, she opened the door to her hotel room, and the defendant was there with two of her children. At that point, the defendant was taken into custody.

The defendant testified at trial that he had been in a relationship with his fiancee for five or six years and that they had been living together for two and a half years, along with her four children from a prior relationship. He testified that he had worked at Methodist Laundry for close to one year and that his employment ended about one year prior to the shooting. That day, he had dropped off the children at school before 7:00 and then had dropped off his fiancee at work. He returned to have lunch with her, as was his custom, bringing food so that they could eat in the car. However, he testified that he never got the chance to eat because Ms. Jackson pulled up in her truck and accused his fiancee of having an affair with the victim. Although Ms. Jackson referred to him as "my man," the defendant testified that he knew she meant the victim. The defendant testified that he asked Ms. Jackson how she knew about the relationship or what made her think that. The defendant's fiancee got out of the car and began arguing with Ms. Jackson until another co-worker stopped her and Ms. Jackson drove off. She then returned to the car with the defendant. She was crying, but she denied having the relationship. She told the defendant she did not want to discuss it at that point, then returned to work, as her break time had expired.

The defendant testified he did not want to believe the rumor and did not believe it at the time. However, the defendant also testified that he "knew something wasn't right"

because his fiancee was crying, and that he suspected she was not telling the truth after he left. He attempted to talk with her on the telephone, but she did not answer. The defendant was upset and unable to eat his lunch. He returned to his landscaping job until it was time to pick up the children.

At around 3:15 p.m., the defendant arrived at Methodist Laundry with the children. He noticed that the bob truck was in the driveway and the gate was open. He pulled in and parked approximately six feet behind the truck. Although the defendant did not know if the victim was working, he knew that it must be one of four drivers operating the bob truck. The defendant testified that he just wanted to ask the victim about Ms. Jackson's accusation. The defendant testified that when he saw Quincy Woods, he went around the front of the truck to the passenger's side. He testified that he had nothing in his hands at the time and that he was not behaving in an aggressive manner but simply wanted to ask the victim about the accusation. The victim saw him and opened the door "a little bit," and the defendant greeted the victim and then asked if he was "messing with" his girlfriend. The defendant denied ever having threatened to kill the victim. The defendant testified that at that point, the victim denied the relationship and attempted to pull the car door shut, but the defendant's arm was caught in the door. A struggle ensued, in which the defendant attempted to free his arm. The defendant testified that the victim then pushed the door open, striking it against the defendant's face. According to the defendant, the victim them jumped from the car and hit the defendant three times in the face. At that point, the defendant testified that he noticed the victim had a gun. When he saw the gun, the defendant feared for his life. The defendant stated that they wrestled over the gun and it went off. When the defendant gained control of the gun, he looked to see if he had been injured; the victim ran off in the meantime.

The defendant testified that he ran after victim and fired the gun; he testified that he "fired up in the air, boom, boom, and I think when I fired it came down," and that was when the victim was injured in his right leg and his shoulder. He was nervous, scared, and sweating. He felt an adrenaline rush during the struggle with the victim. The defendant returned to his car and told the children he would drop them off. He testified that as he was leaving, the gate began to close and the back of his car hit the gate. According to the defendant he did not turn himself in because he was feeling scared and depressed. The defendant testified that he did not go to the laundry with the intent to kill the victim and did not intend to kill him at all.

On cross-examination, the defendant testified that the arrival of the afternoon truck could be unpredictable. He testified it was his right arm that was caught in the truck door. According to the defendant, he intended to leave after the victim denied the affair, and "that would have been the end of it right there. He assaulted me with the door." The defendant testified that during the struggle, the victim grabbed the gun, which had been in the victim's waistband, and the defendant was scared. He testified that he did not have the gun until after

it had been discharged. The defendant further testified that after he had gotten the gun away from the victim, he looked to see if he had been injured and the victim ran off and was gone. The defendant testified that "from looking the point now I was safe" and he would have been safe "[i]f I would have just walked away." The defendant stated that he ran after the victim and turned left inside the building to pursue him. The defendant's testimony confirmed that he owned a gun, but he stated that it was a .38 revolver and that he kept the gun in his closet. The defendant testified that he did not know if the bullets had run out when he ceased firing the gun, but stated that he was recalled to the situation when he saw an older lady who worked at the laundry and who reminded him of his grandmother. He stated he had gone five feet up the aisle past the turn at that point. The defendant testified that when he saw this employee, who worked near Mr. Noe, he turned around and threw the gun to the side on his way out. The defendant testified he did not wear hoodies and had on a camouflage jacket.

The defendant testified that he did not call the police. He testified that his fiancee called him, but he did not have the chance to explain the situation to her because she was hysterical. He stated that he spent the night in his car and spoke to her on the phone all night; the defendant testified that at this point, he told her his version of the events. He stated that he did not know why she did not mention this in her testimony.

## Analysis

The defendant challenges the sufficiency of the evidence supporting his conviction for attempted second degree murder. Specifically, the defendant points to the fact that he did not in fact kill the victim as proof that he did not have the requisite mental state. He also contends that the evidence does not show the absence of a state of passion during the shooting.

Under Tennessee Rules of Appellate Procedure, Rule 13(e), a conviction shall be set aside "if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." A challenge to the sufficiency of the evidence must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted). All conflicts in evidence are resolved in favor of the State's theory, and the Court may not re-weigh or re-evaluate the evidence. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). A presumption of guilt replaces the presumption of innocence, *id.*, and the burden of proving the evidence insufficient to sustain the verdict falls upon the defendant, *State v. Lewter*, 313 S.W.3d 745, 747 (Tenn. 2010).

-10-

Second degree murder under Tennessee Code Annotated section 39-13-210(a)(1) (2012) is defined as a "knowing killing of another." Conduct is knowing "when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). Criminal attempt is defined in Tennessee Code Annotated section 39-12-101:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

In this case, the evidence, viewed in the light most favorable to the State, shows a mental state sufficient to support the conviction. Resolving all conflicts of evidence in favor of the State, the testimony at trial showed that the defendant discovered his fiancee's infidelity a few hours prior to the shooting, and the defendant was not in a state of passion when he walked up to the bob truck. The defendant approached the unarmed victim and stated his intention of killing him. The victim attempted to evade the defendant by closing the truck door; the defendant struggled to keep the door open and discharged his firearm during the struggle. The victim exited the truck and fled into the building. The defendant pursued the unarmed victim through the closed doors, around a corner, and down a corridor, discharging his firearm at least fourteen times during the incident. The defendant left the scene with his weapon and remained at large for a number of days, refusing to turn himself in.

"[W[hether a knowing killing resulted from 'a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner' is a jury question." *State v. Williams*, 38 S.W.3d 532, 539 (Tenn. 2001) (quoting *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995)). The defendant presented his version of events – that the victim was armed, that the victim assaulted him, that he took the gun from the victim, and that he pursued him in a state of passion, shooting into the air – to the jury. The jury was tasked with deciding the question of whether the defendant acted with the

requisite mental state, *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000), and found he did. We are also unpersuaded by the argument that the *mens rea* is disproved by the victim's survival. Attempt is by definition the failure to accomplish the crime, *State v. Kimbrough*, 924 S.W.2d 888, 890 (Tenn. 1996), and the victim's survival does not negate the defendant's mental state. The issue for appellate review is simply whether the evidence was sufficient to support the elements of attempted second degree murder. *State v. Johnson*, 909 S.W.2d at 464. We conclude that it was.

## CONCLUSION

Based on a careful review of the record, we conclude that the evidence was sufficient to support the defendant's conviction for attempted second degree murder, and we affirm the judgment of conviction.

_____

JOHN EVERETT WILLIAMS, JUDGE